TWL

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

No. 5:21-CR-142-1D (2)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | INDICTMENT |
| | ) | |
| STEPHANIE DIANNA ELLIOTT, | ) | |
| aka Stephanie Wilson, | ) | |
| aka Stephanie Moore | ) | |
| aka Stephanie Russell | ) | |
| aka Stephanie Hanchett | ) | |
| aka Vicki Marsh | ) | |
| aka Monica Allen | ) | |
| aka Melissa Standford | ) | |
| aka Jennifer Taylor | ) | |
| aka Heidi Litchford | ) | |
| aka Sandy Morehead | ) | |
| aka Randy Morehead | ) | |
| aka Katie Jones | ) | |
| aka Sharon Mitchell | ) | |
| aka Sharon Miller | ) | |
| aka Sara James | ) | |
| aka Janet Harrington | ) | |

The Grand Jury charges that:

## I.    INTRODUCTION

At all times relevant to this Indictment:

### A.    The Defendant

1. The Defendant, STEPHANIE DIANNA ELLIOTT (hereinafter "ELLIOTT" or "Defendant"), resided in or around Cumberland County, North Carolina, Harnett County, North Carolina, and Dallas County, Texas.

2. Beginning not later than in or about 2010, and continuing through at least 2020, ELLIOTT engaged in schemes to defraud the United States Government and other victims in the Eastern District of North Carolina and elsewhere in connection with federal and state procurement contracts.

3. ELLIOTT created numerous business entities through which she sought to secure government contracts, including but not limited to the following: Star Recruiting-Employment Services, Inc.; Showcase Correctional Products, Inc.; NC Food Distribution, Inc.; Coastal Governmental Contracting; Government Contracting Solutions, Inc.; Wilson Supply and Contracting; Government Parts and Services, Inc.; S&E Military Contracting, Inc.; Cumberland Wholesale Distribution, LP; Ameco Products LP; Chestnut Electronics, Inc.; Vision One Contracting, Inc.; Total Incontinence and Medical Products, Inc.; Tri-State Medical LLC; One Stop Medical Inc.; CSR Foods of Texas, and; Cascade Foodservice Inc.

4. ELLIOTT used numerous name variations and aliases to register her entities to conduct business with state governments and with the U.S. Government, including but not limited to, "Stephanie Elliott," "Stephanie Moore," "Stephanie Wilson," "Stephanie Russell," "Stephanie Hanchett," "Vicki Marsh," "Monica Allen," "Melissa Standford," "Jennifer Taylor," "Dorothy Raines," "Heidi Litchford," "Sandy

Morehead," "Randy Morehead," "Katie Jones," "Morgan Childs," "Sharon Mitchell,"

"Sharon Miller," "Janet Harrington," "Sara James," and "Alissa Miller."

5.      ELLIOTT maintained numerous bank accounts, included but not
limited to those accounts listed in the chart below:

| Institution | Account ending # |
|---|---|
| Navy Federal Credit Union | -2304 |
| Navy Federal Credit Union | -4048 |
| Navy Federal Credit Union | -5611 |
| State Employees Credit Union | -9401 |
| State Employees Credit Union | -1417 |
| State Employees Credit Union | -1726 |
| State Employees Credit Union | -3535 |
| State Employees Credit Union | -9199 |
| State Employees Credit Union | -5889 |
| PNC Bank | -1983 |
| PNC Bank | -5319 |
| Bank of America | -8235 |
| Bank of America | -7409 |
| Wells Fargo | -1478 |
| Wells Fargo | -1830 |
| Wells Fargo | -5424 |
| Wells Fargo | -1184 |
| Branch Bank & Trust | -1354 |
| Branch Bank & Trust | -3496 |
| SunTrust | -7204 |
| SunTrust | -6701 |
| SunTrust | -8577 |
| Pentagon Federal Credit Union | -4011 |
| Pentagon Federal Credit Union | -0013 |
| First Horizon Bank | -9506 |
| Vision Financial Federal Credit Union | -8683 |

## B.      Department of Defense Contracting

6.      The U.S. Department of Defense (DOD) was the federal government

agency charged with providing the military forces needed to deter war and protect

3

the security of the United States. The DOD relied on contractors to support a wide range of military operations.

7.     The Defense Logistics Agency (DLA) was an agency under the DOD. DLA provided worldwide logistics support for the Nation's military and several civilian agencies.

8.     The DOD, through DLA buying centers such as the DLA Land & Maritime, issued purchase orders to their contractors for the supply of various items to be used by members of the United States military.

9.     The U.S. General Services Administration (GSA) was an agency that oversaw the business of the federal government, and whose acquisition solutions supplied federal purchasers with commercial vendors who provided products and services.

10.    All vendors wishing to do business with the Federal Government were required to register with the Data Universal Numbering System (DUNS) and complete a one-time registration in the System for Award Management (SAM), an online U.S. Government system managed and operated by GSA and designed to maintain information relevant to government contracts. The SAM server was located Virginia.

11.    As part of the SAM registration, contractors were required to create an account with a username and password. Contractors were then required to enter certain information into the system concerning their business, including financial account information for receipt of electronic payments.

4

12. Contractors were required to certify that the information entered into SAM was correct, including whether the contractor or any of its principals were presently debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any federal agency. A contractor that fit any of these categories was disqualified from receiving a government contract. Contractors were required to make yearly certifications in SAM.

13. Contractors were also required to obtain a Commercial and Government Entity (CAGE) code. The CAGE code was a five-character identification number used extensively with the federal government and assigned by DLA. The CAGE code was used to support a variety of mechanized systems throughout the government and provides standardized method of identifying a given contractor's facility, at a specific location.

14. For registered contractors, the process to contract with the DOD generally worked as follows: the DOD released solicitations electronically on DLA's Internet Bid Board System ("DIBBS"), an online database through which DOD contractors are able to electronically respond with quotes. Based on the quotes received, the DOD issued Purchase Orders/contracts to a specific contractor for specified required parts. DIBBS allowed vendors to search for, view, and submit quotes. The DIBBS server was located in Columbus, Ohio.

15. The Defense Finance and Accounting Service ("DFAS") was located in Columbus, Ohio and provided operational finance and accounting day-to-day support for DLA and other DOD agencies worldwide. Once shipped, the contractor submitted

5

an electronic invoice to DFAS representing that the parts shipped meet the required government specifications. Upon receiving an invoice, DFAS issued electronic payment to the supplying contractor's bank account. DFAS's servers were located in Ogden, Utah and Columbus, Ohio.

16. In accordance with Federal Acquisition Regulation 13.4, the Fast Payment Procedure ("Fast Pay") allowed contractors to be paid before the Government could verify that supplies were received and accepted by a military customer. Under Fast Pay, the contractor's submission of an invoice constituted a certification that it "(1) [h]as delivered the supplies to a post office, common carrier, or point of first receipt by the Government; and (2) [s]hall replace, repair, or correct supplies not received at destination, damaged in transit, or not conforming to purchase agreement." Fast Pay was often used where delivery of supplies were to occur at locations where there is both a geographical separation and a lack of adequate communications facilities between government receiving and disbursing activities.

### C. **Disqualification from Federal Contracting**

17. Federal Acquisition Regulations authorized government agencies to debar and suspend contractors as a means of protecting government interests in the procurement process and ensuring that they only deal with contractors who are responsible in fulfilling their legal and contractual obligations.

18. The provisions of Title 48, Code of Federal Regulations, Section Subpart 9.4, Debarment, Suspension, and Ineligibility, prescribed policies and procedures

governing the debarment and suspension of contractors by agencies for the causes given in Subparts 9.406-2 and 9.407-2. Causes for suspension, debarment, and declaration of ineligibility included conviction for any offense indicating a lack of business integrity or business honesty that seriously and directly affected the present responsibility of a government contractor or subcontractor, violation of the terms of a government contract or subcontract by willful failure to perform in accordance with the terms of one or more contracts, and a history of failure to perform, or of unsatisfactory performance of, one or more contracts.

19.    Debarred or suspended contractors were excluded from contracts with executive branch agencies.

20.    Federal Acquisition Regulation 52.209.5, "Certification Regarding Responsibility Matters," stated that when a company registers in SAM, it is required to certify [in part] that the offeror and/or its principals are not "debarred, suspended, or proposed for debarment, or declared ineligible for the award of contracts by any Federal agency."

## II.    POST-HURRICANE KATRINA FRAUD

21.    On or about December 30, 2005, Star Recruiting-Employment Services, Inc. d/b/a Showcase Products ("Showcase") was incorporated and registered to conduct business in the State of North Carolina. ELLIOTT was listed as the president and registered agent. On or about August 24, 2006, Showcase was awarded a contract to supply 4.5 million sandbags to the State of Louisiana. The sandbags were to be delivered to the Louisiana National Guard for post-Hurricane Katrina

7

relief efforts. In their winning bid, Showcase agreed to supply the sandbags at $0.20/per bag, for a total contract value of $900,000.

22. "Company A," a business known to the Grand Jury, was a fourth-generation family-owned sandbag manufacturing business located in St. Louis, Missouri.

23. On or about August 28, 2006, a person who identified herself as "Monica Allen" contacted Company A on behalf of Showcase and solicited a bid from Company A to supply the sandbags to the State of Louisiana. Company A was provided with proof of Showcase's Louisiana contract, but not Showcase's contract price of $0.20/per bag. Company A agreed to supply the sandbags to Showcase at $0.33 per bag, for a total contract value of $1,485,000 total. ELLIOTT submitted a purchase order to Company A for 4.5 million sandbags at $0.33 per bag. On paper, ELLIOTT stood to incur a net loss of approximately $582,135 on the deal.

24. From August 29, 2006 to September 8, 2006, Company A shipped all 4.5 million bags to the Louisiana National Guard in satisfaction of the Louisiana contract. Company A then invoiced Showcase for the $1,485,000 due. On or about September 15, 2006, the State of Louisiana paid Showcase $902,865, which constituted payment in full. The funds were deposited into an RBC bank account controlled by ELLIOTT. On September 28, 2006, ELLIOTT made a partial payment to Company A of $400,000, leaving an unpaid balance of $1,087,850. Company A pursued payment of the balance in repeated communication with ELLIOTT. However, ELLIOTT claimed that she had not authorized the contractual terms that

8

her employee "Monica Allen" negotiated with Company A. ELLIOTT claimed that Allen was "on leave until [sic] further notice." ELLIOTT made no further payments to Company A.

25. The $902,865 payment from the State of Louisiana posted to ELLIOTT's bank account on September 18, 2006. On the same date, ELLIOTT used the Louisiana proceeds to pay $13,490 toward victim restitution pursuant to the terms of the criminal deferred prosecution agreement in Durham County Superior Court. The deferred prosecution agreement arose out of the following felony criminal charges against ELLIOTT : 05-CR-42773 (Embezzlement); 05-CR-42774 (Financial Identity Fraud); 05-CR-42775 (Financial Identity Fraud); 05-CR-42776 (Financial Identity Fraud).

26. Also on September 18, ELLIOTT withdrew $17,000 in the form of a cashier's check payable to "Valley Mercedes." The following day, September 19, 2006, ELLIOTT wired $20,000 to her then-husband and withdrew $12,700 in cash.

27. ELLIOTT converted much of the remaining Louisiana funds to personal use. For example, on September 22, ELLIOTT wrote a $15,100 check to cash for "land." On September 28, she wrote a $3,995 check payable to a car dealership for "Mazda MVP – Esther Elliott." On September 29, ELLIOTT wrote an $8,000 check to cash for "pickup truck." On October 5, she wrote a $12,000 cashier's check payable to a loan servicing company. Over a period of approximately eight weeks, ELLIOTT took at least six trips to Atlantic City, NJ or Las Vegas, NV, where she spent

9

thousands of dollars on flights, hotels, casinos and restaurants. During the same period, ELLIOTT withdrew tens of thousands of dollars in cash.

### III.   LOUSIANA PRISON CONTRACTS FRAUD

28.   On or about May 6, 2008, NC Food Distribution, Inc. ("NC Food") was incorporated and registered to conduct business in the State of North Carolina. ELLIOTT was listed as the president and registered agent.

29.   In or around June 2010, NC Food won a series of contracts from the State of Louisiana to supply food products to Louisiana prisons.

30.   "Company B," a victim known to the Grand Jury, was a Mississippi corporation with its principle place of business in Hattiesburg, MS. Company B was a broad line food distribution company that provided products and services to restaurants and other customers.

31.   In or around June 2010, ELLIOTT, on behalf of NC Food, contacted Company B by phone and requested a credit account for the purpose of purchasing food products. On June 17, 2010, Company B received a customer account application which identified ELLIOTT as the President and 100% owner of NC Food. The application was executed by "Vicki Marsh," who was identified as the "Accounts Payable: person to contact."

32.   From June to August 2010, ELLIOTT ordered $260,759.77 worth of products, which Company B delivered to Louisiana prisons in satisfaction of ELLIOTT's contractual obligations.

33.　Of the $260,759.77 owed to Company B, ELLIOTT paid only $47,974.23, leaving an unpaid balance of $215,950.94. In July 2011, Company B filed a federal civil lawsuit against ELLIOTT and NC Food in the Southern District of Mississippi, alleging that ELLIOTT conspired to defraud vendors from whom she purchased goods on credit. The suit alleged that ELLIOTT submitted bids on government contracts in which she agreed to supply products at prices below that which she could purchase them for resale. ELLIOTT then purchased the goods from Company B on credit, which Company B delivered to Louisiana prisons in satisfaction of ELLIOTT's bid. ELLIOTT accepted payment from Louisiana, but failed to pay Company B. A default judgment was entered against ELLIOTT and NC Food on March 30, 2012. To date, Company B has collected nothing on its judgment.

## IV.　**DEPARTMENT OF DEFENSE FRAUD**

34.　Beginning not later than in or about 2011, and continuing up to and including at least 2020, ELLIOTT, through her various business entities, was awarded more than 1,000 federal defense contracts for which she received payment in excess of $2.2 million.

35.　In connection with these contracts, ELLIOTT defrauded the federal Government by exploiting the Fast Pay system. Specifically, ELLIOTT falsely certified that she had satisfied the terms of contracts by shipping the goods, when in fact, the goods had not been and would never be shipped.

11

36. ELLIOTT and or businesses under ELLIOTT's control were debarred from federal government contracting on at least four separate occasions for, among other bases, a lack of business integrity and history of failure to perform.

37. ELLIOTT circumvented the terms of her debarments by using aliases and more than a dozen shell business entities to continue bidding on federal government contracts.

38. After unlawfully obtaining contracts during periods when she was debarred from doing so, ELLIOTT continued her Fast Pay fraud by obtaining contract award payments based upon false certifications regarding the shipment of goods.

39. *N.C. Food Distribution.* Beginning not later than in or about October 2011, NC Food began bidding on defense contracts through DIBBS, with ELLIOTT listed as the primary point of contact. From October 3, 2011 to November 10, 2011, NC Food was awarded approximately twenty-one (21) defense contracts valued at $178,708.40. DLA quickly identified multiple contract awards for which NC Food had been paid but failed to deliver. After efforts to obtain compliance from NC Food were unsuccessful, DLA was advised that the company had filed for bankruptcy and gone out of business.

40. *Coastal Governmental Contracting.* On February 17, 2012, with Company B's lawsuit against NC Food pending, Coastal Governmental Contracting ("Coastal") was registered in the SAM system for the purpose of bidding on federal defense contracts. The only name listed in the SAM registration was "Melissa Standford." Although ELLIOTT's identity was not provided, the SunTrust bank

account ending -6701 provided for the electronic deposit of contract award funds had been opened by ELLIOTT for "Coastal Governmental Contracting dba N.C. Food Distribution." The bank account listed in SAM was subsequently changed to a Pentagon Federal Credit Union ("PFCU") account ending -4011. That account also belonged to ELLIOTT and was used by her in connection with another business, S&E Military Contracting.

41. From February 17, 2012 to October 3, 2012, Coastal was awarded approximately twenty-three (23) defense contracts for which ELLIOTT was paid $120,797 to supply items to military installations and warships located in the U.S. and abroad. All contract payments to Coastal were deposited into the SunTrust and PFCU accounts belonging to ELLIOTT. During this period, DLA fielded numerous complaints from its military customers regarding contracts awarded to Coastal. Military customers complained that their orders were never delivered. Coastal ignored repeated requests from contracting officers for traceability documentation and proof of delivery on numerous unfulfilled contracts. Some of the unfulfilled contracts were Fast Pay, enabling Coastal to receive payment based on false representations that goods had been shipped. ELLIOTT's bank account records reflect that most of the award money Coastal received from its DLA contracts during this period was spent for purposes other than fulfilling contractual obligations. For example, on May 25, 2012, ELLIOTT received a $13,609.82 EFT contract payment. Over the next five days, ELLIOTT withdrew $8,300 in the form of cash and traveled from Fayetteville, NC to Sevierville, TN.

42.   In July 2012, DLA placed Coastal on the Defense Contractor Review List ("DCRL"), a risk-mitigation tool used to identify and monitor contractors with performance or integrity concerns.   By letter dated April 11, 2013, DLA notified Coastal and "Melissa Standford" of their listing for proposed debarment from government contracting for a three-year period lasting April 11, 2013 to April 10, 2016. The proposed debarment became final on May 21, 2013. At the time, DLA was unaware of ELLIOTT's involvement with Coastal.

43.   ***Government Contracting Solutions.***   On August 6, 2012, after Coastal's DCRL designation but before its debarment, Government Contracting Solutions, Inc. ("GCS") was incorporated and registered to conduct business in the State of North Carolina.   The articles of incorporation listed ELLIOTT as the registered agent and sole incorporator.   On October 30, 2012, less than one month after Coastal's last contract award, GCS was registered in the SAM system for the purpose of bidding on federal contracts. The name "Stephanie Wilson" was used to complete the SAM registration. The SECU bank account ending -1417 provided for EFT deposit of contract award payments had been opened by ELLIOTT on September 13, 2012. The same account was used by ELLIOTT in connection with two other contracting businesses, Wilson Supply and Vision One Contracting.  On July 25, 2013, the account of record in SAM was changed to a First Horizon Bank account ending -9506. That account had been opened by ELLIOTT on June 21, 2013.

44.   From November 26, 2012 to April 23, 2014, GCS was awarded approximately sixty-six (66) defense contracts for which ELLIOTT was paid

$455,065.24. All contract award funds were paid by electronic deposit into ELLIOTT's bank accounts. ELLIOTT abused the Fast Pay procedures by collecting payment on contracts for which GCS never delivered. For example, on May 17, 2013, GCS won a contract to supply three industrial coolers at $6,100 per cooler, a total of $18,300. In accordance with Fast Pay, GCS submitted an invoice certifying that it made delivery on May 19, 2013, resulting in immediate payment. However, nothing had been or would be delivered under this order. After receipt of payment under the contract, ELLIOTT traveled to Las Vegas, NV, spending in excess of $15,000 on flights, hotel accommodations, cash withdrawals, and transactions at Caesars Palace.

45. By letter dated May 9, 2014, DLA notified GCS, NC Food, Stephanie Elliott aka Stephanie Wilson, and Joey Elliott of their proposed three-year debarment from federal contracting. The debarment, which became effective June 27, 2014, covered the period May 9, 2014 through May 8, 2017. At the time, contracting officials were unaware of the relationship between GCS and the then-debarred "Melissa Standford" dba Coastal. Nor were they aware of the fact that ELLIOTT was already bidding on defense contracts under a different alias and business.

46. *Wilson Supply & Contracting.* On February 27, 2014, – with the Coastal debarment active and a few months shy of the GCS debarment – Wilson Supply and Contracting ("Wilson Supply") was registered in SAM for the purposes of bidding on government contracts. The only name and point of contact listed in the SAM registration was "Jennifer Taylor," a purported resident of Los Angeles, California. While ELLIOTT withheld her identity from SAM, a bank account

subsequently provided for receipt of contract award funds was an SECU account ending -9199 that ELLIOTT opened on March 27, 2014. The same account was used by ELLIOTT in connection with her other contracting businesses Government Parts and Chestnut Electronics. The SAM account of record was subsequently changed twice: first, to an SECU account ending -3535, also in ELLIOTT's name and used in connection with her businesses Vision One and GCS, and; second, to an SECU account ending -1417 in ELLIOTT's name and used in connection with her business GCS. Despite her active debarment, ELLIOTT certified that Wilson Supply "and/or any of its principals, are not presently debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any Federal agency."

47.     From March 21, 2014, to January 12, 2015, Wilson Supply was awarded approximately seventy-six (76) defense contracts for which ELLIOTT was paid $351,434.17. During this period, DLA fielded numerous complaints from military customers regarding Wilson Supply's failure to deliver goods. Emails, calls and letters to "Jennifer Taylor" regarding the status of delinquent orders went unanswered.

48.     In July 2014, DLA acquisition officers enlisted the Defense Contract Management Agency (DCMA) to visit Wilson Supply's listed business address in Los Angeles, CA. DCMA found no trace of the business at the address. A check with the California Secretary of State revealed no charter or foreign registration. An audit of Wilson Supply's defense contracts identified repeated abuse Fast Pay procedures by invoicing the Government for goods that were never shipped. A review of ELLIOTT's

bank account transactions reflects that only a small percentage of the deposited contract awards could have been used to fulfill contractual obligations. Most of the funds were withdrawn as cash or otherwise converted to personal use at restaurants, lottery tickets, gambling casinos, and vacations.

49. By letter dated June 30, 2015, DLA notified Wilson Supply, Stephanie Elliott fka Stephanie Wilson, and Jennifer Taylor of their debarment from government procurement effective April 24, 2015 through April 23, 2018. At the time, DLA was unaware of the fact that ELLIOTT had used aliases to register two additional businesses through which she was, again, actively bidding on defense contracts.

50. *Government Parts and Services, Inc.* On October 13, 2014, Government Parts and Services, Inc. ("Government Parts") was incorporated and registered to conduct business in the State of North Carolina. The articles of incorporation listed ELLIOTT and D.R. as the two incorporators, and listed D.R. as the registered agent. On October 9, 2014, Government Parts was registered in SAM for the purpose of bidding on government contracts. The name "Dorothy Raines" was provided as the primary point of contact. "Joey Elliott" was listed as manager. The registration included a certification that Government Parts and its principals were not debarred from obtaining federal contracts. At the time, however, ELLIOTT was prohibited from federal contracting by virtue of two active debarment orders. The initial bank account provided for receipt of contract award funds was an SECU account ending -9199. This account belonged to ELLIOTT and was used in connection

with two other contracting businesses, Wilson Supply and Chestnut Electronics. The SAM account of record was subsequently changed to a Bank of America business checking account ending -8235. That account had recently opened by ELLIOTT for Government Parts.

51.     From December 31, 2014 to October 30, 2015, Government Parts was awarded approximately forty-one (41) defense contracts for which ELLIOTT was paid $84,854.08. The contract award funds were deposited into ELLIOTT's bank accounts.

52.     Government Parts quickly established a record of failing to deliver goods on contracts for which it had been paid. For example, on February 25, 2015, they were paid $30,000 on a Fast Pay contract after certifying delivery of goods that, in fact, had not been delivered. The funds were deposited into ELLIOTT'S Bank of America account ending -8235. Within a month's time, ELLIOTT withdrew over $30,000 in the form of cash withdrawals and personal expenditures, including trips to Jamaica and Las Vegas.

53.     **S&E Military Contracting, Inc.**  On April 9, 2015, a SAM registration was completed for S&E Military Contracting, Inc. ("S&E"), a company purportedly headquartered in Georgia. The SAM registration did not include ELLIOTT's name. It was purportedly completed by "Stephanie Hanchett." The name "Sharon Mitchell" was listed as the only point of contact, and the name "Sharon Miller" was listed as the individual executing IRS consent. However, a North Carolina P.O. Box address provided for purposes of IRS consent validation was the same as that used by at least three other contracting businesses belonging to ELLIOTT. An SECU bank account

ending -5889 was subsequently provided for EFT deposit of contract award funds. That account had been opened by ELLIOTT on or about May 16, 2015 and was used in connection with two of ELLIOTT's other contracting businesses, Tri-State Medical and Cumberland Wholesale. The SAM account of record was subsequently changed to a Pentagon FCU account ending -0411 that also belonged to ELLIOTT had that had previously used for Coastal. The SAM registration included a certification that S&E and its principals were not presently prohibited from federal contracting. At the time, ELLIOTT was prohibited from federal contracting by virtue of two active debarments. On April 20, 2015, S&E was incorporated and registered to conduct business in the State of Georgia. ELLIOTT was listed as the registered agent and sole incorporator. On the same date, ELLIOTT's SECU bank account ending -3535 was debited $100 transaction for "Corporations Atlanta."

54. From May 6, 2015 to March 8, 2016, S&E was awarded approximately one hundred six (106) defense contract awards for which ELLIOTT was paid $199,332.64. Most of the contract monies paid to ELLIOTT were Fast Pay contracts for materials that S&E never shipped. The month of June 2015 is illustrative, when $68,750.13 in contract award money was deposited into ELLIOTT's Pentagon FCU account. During the same month, the account incurred $57,410 in debits, more than $22,000 of which consisted of cash withdrawals. The remaining debits consisted primarily of funds transfers to other accounts belonging to ELLIOTT.

55. *Cumberland Wholesale Distribution.* On September 2, 2015, Cumberland Wholesale Distribution ("Cumberland") was registered in the SAM

system with the name "Heidi Litchford," listed as the point of contact. On September 22, 2015, Cumberland was registered to conduct business in the State of South Carolina. Heidi Litchford was listed as the registered agent. In the SAM registration, a Columbia, South Carolina physical address was listed. The address listed for IRS TIN consent was a Fayetteville, NC address where ELLIOTT was known to reside. The bank account provided for EFT deposit of contract award funds was a Vision Federal Credit Union account opened the previous day, September 1, 2015 by ELLIOTT. ELLIOTT later changed the account of record to her SECU account ending -5889 that was simultaneously being used for S&E Military, and later for Tri-State Medical. Through the SAM registration, ELLIOTT certified that neither Cumberland nor any of its principals were debarred from federal contracting. At the time, however, ELLIOTT was prohibited from federal contracting by virtue of two active debarment orders.

56. From October 6, 2015 to January 26, 2016, Cumberland was awarded approximately twenty-six (26) defense contracts for which ELLIOTT was paid $94,492. ELLIOTT employed the same Fast Pay fraud scheme during Cumberland's short-lived period of federal contracting. To illustrate, during the one-month period of October 16 to November 16, $66,425 in contract award money was deposited into ELLIOTT's SECU account ending -5889. During the same period, the account was debited $66,898.82 in the form of cash withdrawals and electronic transfers to other accounts belonging to ELLIOTT. Over a period of four weeks, ELLIOTT traveled to Jamaica, Lake Charles, LA, and twice to Las Vegas, spending tens of thousands in

funds directly traceable to the Cumberland's contract awards. For example, on November 18, 2015, ELLIOTT was paid $22,000 for SPE8E516M0160, a Fast Pay contract for which ELLIOTT failed to deliver. The following day, ELLIOTT transferred $12,000 to her SECU account ending -3535, made a $538 purchase at Victoria's Secret, Fayetteville, then flew to Las Vegas. Over a three day period in Las Vegas, ELLIOTT withdrew $8,500 from ATMs and transferred an additional $4,000 from her SECU account ending -5889 to her SECU account ending -3535. She spent more than $3,000 of flights.

57.    **_Ameco Products LP._**  On September 29, 2015, Ameco Products LP ("Ameco") was incorporated and registered to conduct business in the State of South Carolina. The name "Morgan Childs" was listed as registered agent. On the same date, a Wells Fargo account ending -1830 incurred a $10 debit card purchase for "South Carolina Business One Stop," a government-sponsored web portal through which businesses can, among other things, register in South Carolina. The Wells Fargo account had been opened by ELLIOTT a few weeks earlier, on or about September 10, 2015, in her own name and with her own primary residence address in Fayetteville, NC.

58.    On September 29, 2015, ELLIOTT used the alias "Katie Jones" to register Ameco in SAM. The bank account provided for EFT deposit of contract award funds was the same Wells Fargo account ELLIOTT used to pay the South Carolina incorporation fee. The same account was also used by ELLIOTT to defraud the federal government through another business entity, Chestnut Electronics.

ELLIOTT certified that neither Ameco nor any of its principals were debarred from federal contracting. At the time, however, ELLIOTT was prohibited from federal contracting by virtue of two active debarment orders.

59. From January 7, 2016 to May 10, 2016, Ameco secured approximately twenty-eight (28) defense contracts for which ELLIOTT was paid $21,583.27. All contract award funds were paid directly to ELLIOTT by deposit into her Wells Fargo account ending -1830.

60. **_Chestnut Electronics Inc._** On January 22, 2016, the name "Randy Morehead" was used to register and incorporate Chestnut Electronics, Inc. ("Chestnut") in the State of Delaware. On the same date, ELLIOTT's SECU checking account ending -3535 incurred a $139 debit for "Delaware Division of Corporations." On February 5, 2016, the name "Sandy Morehead" was used to complete a SAM registration for Chestnut Electronics, 800 NW St., Wilmington, DE. A bank account subsequently provided for EFT deposit of contract award funds was a Wells Fargo account ending -1830 in ELLIOTT's name and also used for her sham contracting business Ameco. The remittance name provided for EFT transfers was "SDElliot."

61. As part of the SAM registration, ELLIOTT certified that neither Chestnut nor any of its principals were debarred from federal contracting. At the time, however, ELLIOTT was prohibited from federal contracting by virtue of two active debarment orders. On May 23, 2016, Chestnut's account of record in SAM was changed to an SECU account ending -9199 belonging to "Stephanie D. Elliott, 7827 Bankers Dr., Fayetteville, NC." ELLIOTT used the same account to defraud the

government in connection with two of her other contracting businesses - Wilson Supply and Government Parts.

62.     From April 2016 to January 2017, Chestnut was awarded approximately three hundred seven (307) defense contracts for which ELLIOTT was paid a sum of $435,187.     In the midst of the fraudulent activity, ELLIOTT registered a PayPal account ending -9732 with her alias "Sandy Morehead" as a party to the account. As before, ELLIOTT exploited Fast Pay to receive payment for goods never delivered. To illustrate, from June to July 2016, more than $121,000 in contract proceeds were deposited into ELLIOTT's SECU account ending -9199.  During the same period, nearly all of the funds were withdrawn from the account in the form of cash or by electronic transfers to other accounts belonging to ELLIOTT.  From June 2016 to December 2016, ELLIOTT used money directly traceable to the Chestnut fraud to fund at least 14 trips to such destinations as Jamaica, Aruba, Las Vegas, NV, Cherokee, NC, Lake Charles, LA, and Gatlinburg, TN.

63.     *Vision One Contracting Inc.*   On January 6, 2017, ELLIOTT used her true identity to register and incorporate Vision One Contracting, Inc. ("Vision One") in the State of North Carolina.  On January 23, 2017, ELLIOTT used the alias "Stephanie Moore" to register Vision One in SAM.  For receipt of contract award funds, ELLIOTT provided a SunTrust account ending -7204 opened in her own name in 2016 and shared by her business Total Incontinence. On March 3, 2017, ELLIOTT changed the SAM account of record to an SECU account ending -3535 opened in 2013 in her own name and shared by her businesses Wilson Supply and GCS.  On four

occasions in 2017 (01/23/2017, 03/03/2017, and 06/02/2017, 09/22/2017), ELLIOTT certified that neither Vision One nor any of its principals were debarred from federal contracting. At the time, however, ELLIOTT was prohibited from federal contracting by virtue of two active debarment orders.

64. From February 17, 2017 to June 9, 2018, Vision One was awarded approximately one hundred sixty-four (164) defense contracts for which ELLIOTT was paid $112,452.05. All contract award payments were made directly to SECU accounts belonging to ELLIOTT.

65. ***Total Incontinence and Medical Products, Inc.*** On July 3, 2017, ELLIOTT used her true identity to register and incorporate Total Incontinence & Medical Products Inc. ("TIMP") in the State of North Carolina. On August 10, 2017, ELLIOTT used the alias "Sara James" to register TIMP in SAM. In so doing, ELLIOTT certified that TIMP and its principals were not presently debarred from federal contracting. At the time, however, ELLIOTT was prohibited from federal contracting by virtue of the Wilson Supply debarment order, which included the period of April 24, 2015 to April 23, 2018. For receipt of contract award funds, ELLIOTT provided a SunTrust account ending -7204 opened by ELLIOTT on March 21, 2016, using her legal name and primary residence of 7827 Bankers Dr., Fayetteville, NC. TIMP was not awarded DOD contracts.

66. ***Tri-State Medical LLC.*** On February 23, 2017, ELLIOTT used the alias "Janet Harrington" to register and incorporate Tri-State Medical LLC ("Tri-State") in the State of Georgia. On the same date, ELLIOTT's SECU account ending

-3535 incurred a $100 debit transaction for "Georgia Secretary of State." Four days later, on February 27, 2017, ELLIOTT used the alias "Janet Harrington" to register Tri-State in the SAM system, but provided "ellott step trimed" as the remittance name. For receipt of contract award funds, ELLIOTT provided her SECU account ending -5889, an account that she also used in connection with S&E Military and Cumberland. On August 7, 2017, ELLIOTT accessed SAM and changed Tri-State's account of record to a Wells Fargo account ending -5424 that ELLIOTT had opened on April 17, 2017. ELLIOTT certified that neither Tri-State Medical nor any of its principals were debarred from federal contracting. At the time, however, ELLIOTT was prohibited from federal contracting by virtue of two active debarment orders (04/24/2015→04/23/2018; 05/09/2014→05/08/2017). From April 2017 to August 2017, Tri-State was awarded approximately twelve (12) contracts for which it was paid $25,409.52.

67.     Effective June 19, 2018, ELLIOTT was administratively debarred from DOD contracting for the fourth time. The debarment report cited ELLIOTT's lack of business integrity, supported by multiple contracts awarded to Vision One for which ELLIOTT received payment on contract for items that she failed to deliver. In addition, ELLIOTT had circumvented the terms of her Wilson Supply debarment by continuing to bid on and obtain contracts through Vision One and other entities.

68.     ***One Stop Medical.*** On January 10, 2019, ELLIOTT used the alias "Alisa Miller" to register and incorporate One Stop Medical Inc. ("One Stop") in the State of Delaware. On January 15, 2019, ELLIOTT's Wells Fargo account ending -

1478 incurred an $89.00 debit transaction for the Delaware Division of Corporations. On March 5, 2019, ELLIOTT opened a Wells Fargo account ending -1184 at a branch location in Dallas, Texas. On the same day, ELLIOTT used the alias "Alisa Miller" register One Stop in SAM. For receipt of contract award funds, ELLIOTT provided the Dallas-based Wells Fargo account ending -1184 . ELLIOTT certified that One Stop and its principals were not debarred from federal contracting, when in fact ELLIOTT remained the subject of an active debarment order for Wilson Supply. From June 2019 to December 2019, awarded sixty-five (65) defense contracts $57,469.06.

## COUNTS ONE THROUGH FIFTEEN

69. The allegations contained in paragraphs 1 through 68 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

70. From a date unknown to the Grand Jury, but beginning no later than in or about 2010, and continuing until at least in or about February 2020, both dates being approximate and inclusive, within the Eastern District of North Carolina and elsewhere, the defendant, STEPHANIE DIANNA ELLIOTT, knowingly devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

### Manner and Means

71. The allegations contained in paragraphs 1 through 68 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

Case 5:21-cr-00142-D   Document 1   Filed 03/18/21   Page 26 of 40

72.     For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates set forth below, in the Eastern District of North Carolina and elsewhere, the defendant, STEPHANIE DIANNA ELLIOTT, did transmit and cause to be transmitted by means of wire communication, in interstate and foreign commerce, writings, signs, signals, pictures and sounds, each entry constituting a separate count of this Indictment:

| Count | Date | Description | Amount |
|---|---|---|---|
| 1 | 03/21/2016 | Wire transfer to SECU account ending 5889 | $11,000.00 |
| 2 | 07/07/2016 | Wire transfer to SECU account ending 9199 | $4,976.00 |
| 3 | 07/15/2016 | Wire transfer to SECU account ending 9199 | $7,541.50 |
| 4 | 07/26/2016 | Wire transfer to SECU account ending 9199 | $25,144.00 |
| 5 | 08/12/2016 | Wire transfer to SECU account ending 9199 | $22,982.66 |
| 6 | 08/26/2016 | Wire transfer to SECU account ending 9199 | $8,962.50 |
| 7 | 11/04/2016 | Wire transfer to SECU account ending 9199 | $20,008.00 |
| 8 | 03/09/2017 | Wire transfer to SECU account ending 3535 | $1,371.00 |
| 9 | 04/04/2017 | Wire transfer to SECU account ending 3535 | $2,584.00 |
| 10 | 04/07/2017 | Wire transfer to SECU account ending 3535 | $4,062.03 |
| 11 | 05/03/2017 | Wire transfer to SECU account ending 3535 | $4,818.40 |
| 12 | 05/15/2017 | Wire transfer to SECU account ending 3535 | $3,111.98 |
| 13 | 06/05/2017 | Wire transfer to SECU account ending 3535 | $11,121.07 |
| 14 | 07/24/2017 | Wire transfer to SECU account ending 3535 | $7,443.00 |
| 15 | 09/25/2017 | Wire transfer to Wells Fargo account ending | $18,000.00 |

73. Each of the above-referenced entries constituting a separate violation of Title 18, United States Code, Sections 1343.

## COUNTS SIXTEEN THROUGH EIGHTEEN

74. On or about the dates listed below, within the Eastern District of North Carolina and elsewhere, the defendant, STEPHANIE DIANNA ELLIOTT, did knowingly engage and attempt to engage in monetary transactions affecting interstate commerce, as described below, each transaction involving criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, the fraud scheme described in Counts One through Fifteen of this Indictment, in violation of Title 18, United States Code, Section 1343, each entry below constituting a separate count of the Indictment.

| COUNT | DATE | DESCRIPTION | AMOUNT |
|---|---|---|---|
| 16 | 03/22/2016 | Transfer from SECU -5889 to SECU -3535 | $11,000 |
| 17 | 07/26/2016 | Transfer from SECU -9199 to SECU -3535 | $25,300 |
| 18 | 11/05/2016 | Transfer from SECU -9199 to SECU -3535 | $20,000 |

Each of the above-referenced entries constituting a separate violation of Title 18, United States Code, Section 1957.

## V.    STATE OF NORTH CAROLINA CONTRACT FRAUD

75. Through business entities that ELLIOTT incorporated, registered, and controlled, as previously identified in this Indictment, ELLIOTT bid on contracts to

supply the North Carolina Department of Public Safety (NCDPS) with food products. In an effort to win those contracts, ELLIOTT submitted bids at prices below that which ELLIOTT could reasonably obtain the goods on the open market. After contracts were awarded to ELLIOTT, she subcontracted the work to third party vendors ("Victim Vendors") who agreed to ship the goods to NCDPS in satisfaction of ELLIOTT's contractual obligations. ELLIOTT agreed to purchase the goods from the Victims Vendors at prices above that which ELLIOTT had agreed to supply such goods to NCDPS. ELLIOTT failed to disclose this to the Victim Vendors.

76. ELLIOTT made misrepresentations to induce the Victim Vendors into performing the contractually required work. For example, she falsely promised to pay the Victim Vendors for their work. ELLIOTT also submitted credit applications with false information.

77. When ELLIOTT was then paid by the government or by a third-party creditor for the work performed by Victim Vendors, she failed to pay Victim Vendors and instead retained some or all of the fraud proceeds for her personal benefit.

78. On or about June 29, 2017, ELLIOTT, on behalf of Vision One, submitted a bid for a contract to supply the North Carolina Department of Public Safety (NCDPS) with 9,520 cases of canned turnip greens. In the winning bid, ELLIOTT agreed to supply the canned turnip greens at $12.50/case, a total contract value of $119,000. The contract was awarded to Vision One on or about July 25, 2017. On or about August 31, 2017, Vision One won a second contract to supply NCDPS with 24,752 cases of spinach at $17.25/case, a total contract value of $426,972.

29

79.　Victim Vendor #1, a victim known to the Grand Jury, was a broadline food distributor headquartered in Houston, Texas. Victim Vendor #1 maintained an office and distribution center in Selma, North Carolina.

80.　On or about August 9, 2017, using the alias "Stephanie Moore," ELLIOTT submitted a credit application to Victim Vendor #1 for the purpose of financing the purchase of canned vegetables for delivery to NCDPS. ELLIOTT provided a fictitious Social Security Number and falsely stated that Vision One had been in business since 2014, when in fact it was established on or about January 6, 2017. Victim Vendor #1 approved ELLIOTT's credit application and authorized ELLIOTT to purchase canned vegetables on "net thirty-five day" terms, meaning that full payment was due within thirty-five days of delivery of the goods.

81.　The Automated Clearing House Network ("ACH") was a nationwide secure system through which financial institutions electronically processed credits and debits between businesses, the government, and consumers.

82.　ELLIOTT authorized Victim Vendor #1 to collect on outstanding invoices by ACH debits from ELLIOTT's PNC bank account ending -1983.

83.　ELLIOTT subsequently submitted orders to Victim Vendor #1 for the purchase of canned vegetables for delivery to NCDPS. ELLIOTT agreed to procure the spinach and turnip greens from Victim Vendor #1 at $18.75 per case. ELLIOTT failed to disclose that her contract with NCDPS was for $12.50 per case for turnip greens and $17.25 per case for spinach. On paper, ELLIOTT stood to lose

approximately $59,500 on the turnip greens and $4,200 on the spinach – a would-be combined loss of $63,700.

84. From August 28, 2017 to November 14, 2017, Victim Vendor #1 caused vegetables to be shipped to the North Carolina prison system in satisfaction ELLIOTT's contract with NCDPS.

85. In accordance with the terms of ELLIOTT's credit agreement, Victim Vendor #1 attempted multiple ACH debits from ELLIOTT's PNC bank account ending -1983 in an effort to collect payment, all of which were declined due to insufficient funds. ELLIOTT paid Victim Vendor #1 only $35,700, leaving an unpaid balance $199,802.62 owed to Victim Vendor #1.

86. By January 2018, Victim Vendor #1 had stopped shipping for Vision One as it sought to collect on ELLIOTT's $199,802.62 delinquent accounts receivable balance.

87. Victim Vendor #2, a victim known to the Grand Jury, was a wholesale food distributor headquartered in Illinois.

88. On January 17, 2018, ELLIOTT contacted Victim Vendor #2 regarding the procurement of chopped spinach pursuant to Vision One's ongoing, ship-as-needed, contract with NCDPS. Victim Vendor #2 agreed and opened a credit account for Vision One. ELLIOTT subsequently ordered the spinach from Victim Vendor #2 at $20.75 per case. ELLIOTT failed to disclose that she was contractually obligated to supply the spinach to NCDPS at a price of only $17.25 per case.

89. From February 5, 2018 to February 8, 2018, Victim Vendor #2 delivered 4,760 cases of spinach in satisfaction of Vision One's contract with NCDPS. ELLIOTT paid none of the $98,770 owed to Victim Vendor #2.

90. ELLIOTT's spinach contract with NCDPS included a requirement that the product be "USDA Grade A certified." Grade standards are issued by the US Department of Agriculture (USDA) and designate different levels of food quality. The Agricultural Marketing Service (AMS) of the USDA is responsible for sampling processed foods and providing a Certificate of Quality and Condition. Grading factors include fill of container, quality, characteristics, and defects. US Grade A is the quality of canned spinach that has a good flavor and odor and is attractive in appearance and eating quality within the limitations set forth as to: color, character, stem material, damage and harmless extraneous material.

91. ELLIOTT was asked to provide a USDA-AMS certificate for the spinach she supplied NCDPS. In an effort to deceive NCDPS, on February 4, 2018, ELLIOTT activated an e-Fax account in the name of "McCall Farms" with assigned fax number (843) 474-0153. The next day, February 5, 2018, NCDPS received a fax purportedly from McCall Farms in reference to purchase order # NC10411018 (issued 1/3/2018, 4,760 cases, $17.25 per case, $82,100 total), contract 201701017. The fax header and coversheet reflected that the fax was sent from "McCall Farms, (843) 474-0153". The fax included a purported USDA AMS Certificate for the spinach delivered under the purchase order.

92. The fax was not sent by McCall Farms, but rather by ELLIOTT in an effort to deceive NCDPS. The USDA-AMS certificate was fraudulent. The spinach that ELLIOTT caused to be delivered to the prison system was not USDA graded. At least sixteen cases were found to be spoiled and unfit for consumption.

## COUNTS NINETEEN THROUGH TWENTY-TWO

93. The allegations contained in paragraphs 1 through 68 and 75 through 92 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

94. Beginning no later than in or about August 2017, and continuing until at least in or about February 2018, both dates being approximate and inclusive, within the Eastern District of North Carolina and elsewhere, the defendant, STEPHANIE DIANNA ELLIOTT, knowingly devised and intended to devise a scheme and artifice to defraud Victim Vendors, and to obtain money and property from Victim Vendors, by means of materially false and fraudulent pretenses, representations, and promises.

### Manner and Means of the Scheme

95. The allegations contained in paragraphs 1 through 68 and 75 through 92 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

### The Use of the Wires

96. For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates set forth below, in the Eastern

33

District of North Carolina and elsewhere, the defendant, STEPHANIE DIANNA ELLIOTT, did transmit and cause to be transmitted by means of wire communication, in interstate and foreign commerce, writings, signs, signals, pictures and sounds, each entry constituting a separate count of this Indictment:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 19 | 10/11/2017 | Electronic ACH payment from PNC account ending -1983 in the amount of $35,700 |
| 20 | 12/04/2017 | Electronic ACH payment from PNC account ending -1983 in the amount of $143,752 |
| 21 | 12/20/2017 | Electronic ACH payment from PNC account ending -1983 in the amount of $90,000 |
| 22 | 02/05/2018 | Electronic fax from (843) 474-0153 containing fraudulent USDA certificate |

Each of the above-referenced entries constituting a separate violation of Title 18, United States Code, Sections 1343.

## VI.   BUSINESS FINANCING FRAUD

97.     Invoice financing is a form of short-term borrowing that is extended by a lender to its business customers. Invoice financing allows a business to use its unpaid invoices as collateral for financing.

98.     Victim Vendor #3 was an invoice-based financing business incorporated under the laws of the State of Florida.

99.     In August 2017, on behalf of Vision One, ELLIOTT submitted an online application to Victim Vendor #3 for a line of credit. The application listed "Stephanie Moore" as the registrant and "Stephanie Elliott" as the owner.   Victim Vendor #3 approved the application and extended Vision One a $250,000 line of credit in connection with Vision One's contracts to supply canned food to NCDPS.   In

34

accordance with the terms of the agreement, individual advances on the credit line were predicated upon ELLIOTT's submission of unpaid invoices arising out of her contract with NCDPS.

100. Beginning no later than in or about August 2017, and continuing until at least in or about February 2018, ELLIOTT defrauded Victim Vendor #3 by submitting fraudulent invoices purportedly arising out of ELLIOTT contracts to supply canned food to NCDPS.

101. From September 1, 2017 to February 20, 2018, ELLIOTT submitted twenty-three (23) invoices to Victim Vendor #3. Based upon these invoices, Victim Vendor #3 made twenty-four (24) credit advances to ELLIOTT totaling $380,538.86. However, of the twenty-three (23) invoices ELLIOTT submitted to Victim Vendor #3, seventeen (17) were fraudulent.

102. In October 2017, Victim Vendor #3 made seven (7) credit advances to ELLIOTT totaling $76,028.92. The funds were paid by wire transfer to ELLIOTT's PNC account ending -1983. During the same month, ELLIOTT withdrew $25,700 in cash through ATM and counter transactions.

103. In November 2017, Victim Vendor #3 made three (3) credit advances to ELLIOTT totaling $40,729.31. The funds were paid by wire transfer to ELLIOTT's PNC account ending -1983. During the same month, ELLIOTT withdrew $27,595 in cash through ATM and counter transactions.

104. In December 2017, Victim Vendor #3 made three (3) credit advances to ELLIOTT totaling $65,156.77. The funds were paid by wire transfer to ELLIOTT's

PNC accounts ending -1983 and -5319. During the same month, ELLIOTT withdrew $33,588 in cash through ATM and counter transactions.

105. In January 2018, Victim Vendor #3 made two (2) credit advances to ELLIOTT totaling $53,759.57. The funds were paid by wire transfer to ELLIOTT's PNC account ending -5319. During the same month, ELLIOTT withdrew $39,333.97 in cash through ATM and counter transactions.

106. In February 2018, Victim Vendor #3 made two (2) credit advances to ELLIOTT totaling $79,360.19. The funds were paid by wire transfer to ELLIOTT's PNC account ending -5319. During the same month, ELLIOTT withdrew $24,585 in cash through ATM and counter transactions. ELLIOTT transferred an additional $30,000 to her SunTrust account ending -7204.

### COUNTS TWENTY-THREE THROUGH TWENTY-NINE

107. The allegations contained in paragraphs 75 through 92 and 97 through 106 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

108. Beginning no later than in or about August 2017, and continuing until at least in or about February 2018, both dates being approximate and inclusive, within the Eastern District of North Carolina and elsewhere, the defendant, STEPHANIE DIANNA ELLIOTT, knowingly devised and intended to devise a scheme and artifice to defraud Victim Vendor #3 and to obtain money and property from Victim Vendor #3, by means of materially false and fraudulent pretenses, representations, and promises.

36

## Manner and Means of the Scheme

109.    The allegations contained in paragraphs 75 through 92 and 97 through 106 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein

### The Use of the Wires

110.    For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates set forth below, in the Eastern District of North Carolina and elsewhere, the defendant, STEPHANIE DIANNA ELLIOTT, did transmit and cause to be transmitted by means of wire communication, in interstate and foreign commerce, writings, signs, signals, pictures and sounds:

| COUNT | DATE | DESCRIPTION | AMOUNT |
|---|---|---|---|
| 23 | 10/26/2017 | Wire transfer to PNC account ending 1983 | $13,816.89 |
| 24 | 11/02/2017 | Wire transfer to PNC account ending 1983 | $13,905.98 |
| 25 | 11/09/2017 | Wire transfer to PNC account ending 1983 | $13,735.10 |
| 26 | 12/27/2017 | Wire transfer to PNC account ending 5319 | $41,467.37 |
| 27 | 01/05/2018 | Wire transfer to PNC account ending 5319 | $13,353.11 |
| 28 | 01/24/2018 | Wire transfer to PNC account ending 5319 | $40,406.46 |
| 29 | 02/20/2018 | Wire transfer to PNC account ending 5319 | $66,203.98 |

Each of the above-referenced entries constituting a separate violation of Title 18, United States Code, Section 1343.

37

## COUNTS THIRTY THROUGH THIRTY-ONE

111.   On or about the dates listed below, in the dates listed below, within the Eastern District of North Carolina and elsewhere, the defendant, STEPHANIE DIANNA ELLIOTT, did knowingly engage and attempt to engage in monetary transactions affecting interstate commerce, as described below, each transaction involving criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, the fraud scheme described as described in Counts Twenty-Two through Twenty-Eight of this Indictment, in violation of Title 18, United States Code, Section 1343, each entry below constituting a separate count of the Indictment:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 30 | 12/28/2017 | Withdrawal of $14,185 from PNC account ending 5319 |
| 31 | 02/28/2018 | Transfer of $30,000 from PNC account ending 5319 to SunTrust account ending 7204 |

Each of the above-referenced entries constituting a separate violation of Title 18, United States Code, Section 1957.

## FORFEITURE NOTICE

Upon conviction of any one or more of the offenses alleged in Counts One through Fifteen, and Nineteen through Twenty-Nine of this Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), as made applicable by Title 28, United States Code, Section 2461(c), any property constituting, or derived from, gross proceeds obtained directly or indirectly as a result of said offenses.

Upon conviction of Counts Sixteen through Eighteen, and Thirty through Thirty-One of this Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1) any property, real or personal, involved in such offense and any property traceable to such property.

The forfeitable property includes, but is not limited to:

(1) personal property;

(2) real property; and

(3) the gross proceeds obtained by the defendant.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant,

(1)     cannot be located upon the exercise of due diligence;

(2)     has been transferred or sold to, or deposited with, a third party;

(3)     has been placed beyond the jurisdiction of the Court;

(4)     has been substantially diminished in value; or

39

(5)   has been commingled with other property which cannot be divided
without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture

of any other property of the defendant up to the value of the above forfeitable

property.

A TRUE BILL

REDACTED VERSION

Pursuant to the E-Government Act and the
federal rules, the unredacted version of
this document has been filed under seal.

FOREPERSON

3/17/ 2021

DATE

G. NORMAN ACKER, III
Acting United States Attorney

TOBY W. LATHAN
Assistant United States Attorney
Criminal Division